Okay, next case on the docket is O'Leary v. American Online, 13-0050. Good morning, may it please the court. My name is Philip Bach, and I'm here on behalf of our law firm, which is now called Bach & Hatch LLC. The trial court found there was no evidence of a joint venture, and did so either by rejecting the undisputed evidence or by applying the wrong legal standard to determine the evidence required to prove a joint venture between lawyers acting as co-counsel on a contingency case. Here there was no dispute that the firms had a joint venture to pursue the Rosa White v. AOL case in Madison County. And that case was voluntarily dismissed and refiled as part of the O'Leary case in St. Clair County as part of a settlement. And the trial court distinguished those cases and held that there was no joint venture in the combined O'Leary-Rosa White v. AOL case. In the Johnson case, the Illinois Supreme Court held that were two attorneys represent a client on a contingency basis, then they are joint ventures. And in the Thompson v. Hyder case, the appellate court observed that arguably in such a situation, there's no need to prove any of the elements of a joint venture because that relationship itself meets the requirements of a joint venture. And here there's no dispute that my firm was listed as lawyers for the class of the plaintiffs in the amended complaint in the O'Leary-White case, or that we were the lawyers directly retained by Rosa White who was one of the named plaintiffs. And for that reason, the trial court should be reversed because it applied the wrong legal standard and found no joint venture when it was undisputed that there was a joint venture as a matter of law. But here there was plenty of undisputed evidence that the trial court improperly rejected. First, there was the course of conduct between the law firms involving nearly 70 class actions starting in 2002 with a written understanding that they would share the fees in cases equally and recognizing that it was possible that one firm would do substantially more work in one case while another firm's doing the work in another case and dividing the work based on people's expertise and skills. Here the Weiss firm was excited about filing the Rosa White products case against AOL in Madison County and specifically warned the group not to give any publicity to the case for fear that somebody else might copy it. And my firm performed substantial, substantive work in the Rosa White case that pushed AOL to settlement, including issuing discovery when Mr. Weiss said, AOL's lawyers say they're not interested in settling, we've got to get the discovery, sir. As I said before, Weiss, White was voluntarily dismissed to join the O'Leary case and my firm was listed as counsel for the plaintiffs and the class on all the pleadings except for the single joint fee petition filed at the end by Mr. Weiss with the MDL lawyers from California, they filed a joint fee petition and our firm's name disappeared and they didn't serve us worth a copy. Weiss testified in this case that he had asked me to do the White case in order to help push O'Leary to settlement and he admitted that the firms had litigated numerous class actions together as co-counsel without a written agreement and admitted that we always split the fees evenly. Did he get $50,000 or so in a fee in that case here? So he did give us a check after the fact, he gives us a check for $50,000. You never checked the check and sent it back to him? I don't remember if we sent it back but we did not cash it and we told him that he owed us more money and at the time the firms were litigating a whole bunch of cases together and so now you have this rift. Were there other attorneys that got checks in that case too? Yes, they paid $200,000 to Donald O'Leary's law firm and four or five other law firms got money who weren't listed on any of the pleadings or anything, I'm not sure why they were paid. And then all the California people who had a case in federal court in California filed a case in St. Clair County and they were immediately consolidated and settled and that group from the MDL got 45% of the fees, $3.5 million or whatever. And as Your Honor pointed out, Mr. Weiss didn't send us money so he admitted that he owed us money, it was just less than he owed us. But the trial court concluded. And you wanted to have one third of the thing. That's right, yes. And thought that we were owed that because that's what we got on all the other cases. But the trial court concluded that we should have had a written agreement and that doesn't comply with Illinois law because Illinois does not require a written agreement between joint venturers even when the joint venturers are lawyers. Nor does it require a formal agreement. Instead, under Johnson, the law is that when lawyers jointly represent clients on a contingent basis, they do so as joint venturers. And here we jointly represented the plaintiffs on the amended complaint and in particular named plaintiff Rosa White who retained our firm only directly and consented to us working with Mr. Weiss's firm. And for those reasons, the trial court should be reversed. Thank you, counsel. Counsel? Good morning, Your Honor. I don't get to be here as much as I used to and I enjoy the privilege so I guess I have that Mr. Bach to thank for that. I had sort of a more worked out argument here, but after hearing Mr. Bach, the only word that comes into my head is none. You'll have to speak up for recording today. The only word that comes into my head is nonsense. This is a fellow who did nothing in the case. No time, no expenses. We spent $200,000. We traveled all over the country. We participated in the federal All Rights Act case in the Ninth Circuit in California. We spent hundreds, if not thousands of hours of work. He's coming in here. He went in to Judge Gleeson and he said, I want $1.2 million for nothing. We had a trial. He testified he did nothing. He didn't even know what the settlement terms were. He didn't know how they were negotiated. This was an unbelievably complicated case. This was the early days of e-commerce. This is AOL. I mean, they sort of almost disappeared. But in the early days, they were the big player. There were 25 lawsuits filed all over the country in the state and federal courts. Now, if I owe him $1.2 million, what do I owe Mr. Horner? He actually showed up. You know, we haven't left the days in which you actually have to work for a living. We haven't left the days in which you come into a case at the very end, quite honestly, as a complete favor. You get $50,000. You ask the question, what did he do with the check? He stuck it in his pocket. The first time anyone heard that he claimed he was a joint venturer, and I tell you, that case is so confusing that he's making. The first time he claims he's a joint venturer is almost a year after he gets the check. He gets the check in May of 2006, right when the settlement worked its way to the final days. He keeps the check. He then announces in February of 2007 that he's entitled to more money. He tries the case. We're not here on a motion for summary judgment, Horner. We're not here on a summary judgment. We're here after a trial of the case. Two complete days of evidentiary hearing, August of 2011. I'm sorry, 10. Another one in, I think, February of 2011. Horner in July of 2012. He puts on all of his evidence. This was a trial in which he claims he had a joint venture. You know, if somebody walked into my office and said, hey, you know, Mr. Burke, would you represent me? I think I'm out $1.2 million. And I say, well, what did you do for it? They say, well, you know, I didn't do anything. Okay? On what basis did you give him the $50,000? You said a favor, but explain that a little more in detail. Here's what happens in the end. And I'll get to my cross appeal, but I'll give you the basic facts. Okay? We had dozens and dozens of lawyers. Once the pie comes out of the oven, the knives come out. Okay? A lot of people wanted to be paid. We had to cut a deal with the guys in California, which was a huge group. We brought them in. They got $3.something million. Well, you invited them to join, didn't you? Your suit? Yeah, after we settled the case. We had completely settled the case. Completely? You know, completely. What? Completely. Well, as you know from the facts, we settled it in Illinois. We got preliminary approval. Then the federal people got an all writs act in the Central District of California that stopped our case. Then we bought that case. It was called the spinoff litigation. And it had dozens of lawyers. We then went to the mediator that we had with AOL, who mediated with us. And then all of those two groups got together, and we reached another settlement for the O'Leary case. And the complexity of that settlement is that the people coming in from California wanted to be able to unwind an agreement if the St. Clair County Court didn't approve it. So the way we did that is they filed a separate lawsuit on Ducey. And then we agreed to a joint consolidation of the two cases. Once the two cases were consolidated, we filed the second preliminary approval, so to speak. The second settlement. And in the second settlement, it was almost identical to the first settlement, except there were some additional features. And of course, we globally settled all of these cases from all over the country. And so it was a second settlement. And the second settlement went through. We had to file an amendment to the plaintiff, which is commonly done in class action settlements, because you now get kind of a new situation, and maybe there's a new set of circumstances that these players may face. So we filed it. And after we had originally settled with AOL, Mr. Fox, who had been in cases with us. We had those clients who were in the class. We then joined the case. We joined the four other out-of-state plaintiffs. We joined plaintiffs who passed from Chicago, Jose Sanchez.  We had a woman in Oklahoma, which was another rebellion, because there was an Oklahoma settlement and an injunction we had to deal with. I mean, this was a very complicated lawsuit. We brought in a lot of people. Mr. Marner's firm was in the lawsuit with us. So, but that doesn't make, first of all, in class actions, in order to represent a client, a class, as you know, you have to be appointed by the court. The Johnson case that they like, I don't know if I answered your question or not, Judge. Well, I guess what I'm trying to determine in my mind, was there any benefit to you in joining? Not really. Was there any detriment to you in not having them join? Not really. I mean, the only option that Rosa Wright would have had was to hop out. Her case was settled. Now, she got out and go on her own with her credit alert case. There was an additional lawsuit against a vendor of credit alert called Trilegion. There's a whole lot of inside baseball in this, isn't there? I'm sure. Well, look at this. I mean, this was a monumental case. And for somebody to literally come in and say, I want one point, it doesn't even sue the other joint venture. It just sues us. It doesn't sue the Lincoln. I mean, you know, the whole thing was just ridiculous. And I hate to say that. You know, I mean, it's nice to say more civil terms than that, but to be honest with you. So, we say, look, we've done all the work. Fifty, you don't even deserve fifty, but you know, this was a, we're in business. So, today isn't as old as tomorrow. So, we gave him the $50,000. He never says anything about it. We don't know that he hasn't cashed the check. The first time we find out is when he sends the 1099 back. Okay? And he doesn't even do anything then. If I was a joint venture that was entitled to $1.2 billion, how many seconds would I have bought it for instead of the $90,000? Okay. Here are the things. When I see both the people that supposedly took the money away from me. He's a lawyer. You go all this way down the case. You participate in nothing. You do nothing. You don't spend a nickel. You get hundreds of thousands of dollars and thousands of thousands of hours in this case. You do nothing. And somehow claim, oh, well, because we had other cases in the past, we have a joint venture. And you have a trial. This assessment of the demeanor of witnesses for the determination of credibility is ancient to law. It creates the difference between trial courts and appellate courts. It creates the standard of review. Manifest against the manifest way to the evidence. Judge Gleeson is a patient man. He's also pretty deliberate. He gave us a lot of time. This is a two-witness trial. One witness and another witness. One supposed joint venture and another. Apparently, none of the joint venturers thought they had a joint venture. They didn't pay him the money. He didn't complain. He didn't show up at all. Not for the preliminary approvals. Not for the final approvals. Not for the negotiations. Not for the analysis of the case. Not for anything. That Johnson case that he cites, Johnson's a disciplinary case. In which one lawyer in the joint representation of a single client, not a class action, a single client, forged the name of the other lawyer. And now he's in front of the ARDC and determining whether or not that was a forgery. How did your client have a $50,000 check you gave to the other guy? Why did you issue the $50,000 check? He was a lawyer in the case. And we thought that, because we were, honestly, there was no good reason. Pardon me? There was no good reason to give it to him, except that he was a lawyer in the case. He hadn't done any work. Everybody else that got paid in the case had done some work. Let me, if you don't mind, just jump to the cross of your question. Because I think, you're asking me questions now that I wish I had had a record on, to be perfectly honest with you. And that's kind of the problem we have now. Judge Gleeson, I think of him as a young man. Maybe he doesn't feel that way sometimes, but I see him that way. I think at the end, the first time that they ever requested the $50,000 as a judgment was at the post-trial motion. Okay? The post-trial motion. And the trial was over with, my gosh, we were already two years into it. I mean, you know, we spent two years on this thing. At the post-trial motion, if I had known that that was going to be an issue in the lawsuit, I would have put some testimony on it. And I can tell you the first thing I would have done is I would have asked him when he was on the witness stand, what did you do for the $50,000? That was the first thing I would have done. Why are you entitled to it? Second thing I would have done. Why didn't you just say right away, this isn't right, instead of waiting a year and then simply rejecting a 1099 form? He never returned the check at all. So I would have been able to ask him those questions. I would have been able to defend against the Quantum Maryland claim, which is the usual way these things come up, is where there is a vague contract for some reason. And so there's this question of what am I entitled to? And I would have been able to put on that evidence. It was simply never tried in the case. Now, I preface that with talking a little bit about Judge Gleeson. I have been doing this work, I have been in these vineyards for 30 years, and I am firmly convinced, and hopefully this won't be used against me, that I just don't have the temperament of a judge. Because I think that what happened is that that was a reasonable settlement of this dispute. That all he needed to do was to take the $50,000 and end the case. And it would have made a lot of sense to do that. And quite honestly, it's an accord and satisfaction. It would have made a disputed claim by contesting parties in which somebody says, well look, okay, here's the money, we're not going to litigate this thing anymore, that's it, we're done. Except that as a judge, as reasonable as that outcome is, and as much sense as it makes, you can't do it because you can't establish the quid pro quo. So I give him the $50,000, we're still here today for $1.2 million. That's the problem that I have with that situation, is I would have been able to litigate that issue if it had been in the case. And this isn't the first situation where somebody turned down money that was probably more than they were entitled to because they wanted more and got scoped. You know, that happens. But what did he do that he deserved it? Nothing. Nothing. Now, would it have been a reasonable out for a disputed claim? Sure. Sure it would. But we can't settle the case in the courtroom. We must do it on the courtroom steps. And if that was the way to get out of this thing, I can tell you right now, it was worth it to me to give him $50,000 just not to be here. Although I do like to be here. But I think you can appreciate what I'm saying. And this idea that we were in dozens of cases, yeah, we had a business relationship. Was it a joint venture? No, it wasn't a joint venture. We never know how these things are going to turn out. We had Rosa White. Look, people that stand up and be willing to be class representatives, God bless them. Because it's a thankless task. And we certainly had no reason to throw her over the door. She got a $5,000 incentive. Okay? And she did more work than he did. So, you know, we have, he had to prove his case. He didn't prove it. Saying that somehow he was held to an unreasonable burden. His burden, when I briefed the court on this, I said that his burden was clear in convincing evidence. I think it's beyond a preponderance of evidence to establish this. The judge didn't find, couldn't figure out what the case was. Did we have some contract from 2002 that didn't list this case that was a joint venture agreement? Did we have a course of conduct? Did we have some $50,000 that was supposed to pay? Where's the case? Even if you knew what it was, what is it? But, again, I still have to work for a living. Okay? I wish I could get a gig like that where I could say, well, I was in business for some folks for a while, and now I get half, a third of everything they get forever. That'd be nice. But that's not the world that I live in, and it shouldn't be, because it isn't the world. And to say that this judge's ruling was against the manifest way of the evidence, it's just not there. It's not there in any honest assessment of a contested issue of fact. All these facts about what these other cases, he made money on these cases. You know, he made money on the cases. But you don't make money on the cases you don't do anything. Okay? I could go on about this, but I think you got the point. And the real – well, I'm not going to conjecture about why he did what he did when he did it, and why I'm not here with the other joint ventures, but I think the answer's going to be pretty clear because there just isn't any lawsuit there. And I wish our relationship hadn't ended the way it did. But not only did he not have a good reason for a case, but he's also given us a pretty good reason not to do business with him, and I can tell you that. Thank you. Thank you, counsel. Rebut. Mr. Burke doesn't have any answers to the following things. Why was Rosa White added to the O'Leary case? Why was my firm added as counsel for the plaintiffs and including Rosa White and put on all the pleadings? Why was my name left off the fee petition? Why wasn't it served on me? Why did they send me $50,000? Today he's mystified that they sent $50,000. He's not sure why. Is faith in me? Is my client in more than me? All this other stuff. But he ignores the fact that the three firms were all co-counsel on the Rosa White case. Did you want $50,000 at that time? Did you tell the judge we need $50,000? No. We did have a joint venture. That he says we didn't is confusing to me. Because the evidence is unperfuted about the other cases we were litigating at the same time, and the ones that paid were split evenly. There's about ten of them. All split evenly except this one. Why didn't you sue the Lakin firm? Not that you had any obligation to. Well, we're here because they filed a motion. They filed a motion in the trial court. Why didn't they add the Lakin firm or something? But the other thing is when the Lakin firm and them got into litigation, they settled. And I believe they're the firm responsible under that agreement to pay me. But the point is they brought the motion. They should have had the burden of showing these hours or whatever. Because Mr. Burke says they did hundreds or thousands of hours of work. There's no evidence of that in the record. There's none. There's no evidence of hundreds of thousands of expenses. But if you look at the O'Leary record, you'll see a case that was just filed and then laying there. And it had beaten a motion to dismiss at one time when it started off as a case about AOL services if you get charged after you cancel. And the Rosa White case was about a whole different thing. It was about products that you're being charged for automatically without asking for them. And the O'Leary case was filed and it sat there. And eventually there was a – they tried to add the products claim to the O'Leary case. AOL objected, moved to dismiss, argued Don O'Leary doesn't have standing to litigate that claim, et cetera. And AOL demanded and wanted the Rosa White case to be resolved. How could they have been my co-counsel in front of Judge Byron and had that case still going and settled the O'Leary case? They couldn't. They had to settle them together if they wanted to settle it in one case. They could have settled it all in the Rosa White case in front of Judge Byron. They decided to do it in the O'Leary case instead and apparently to throw us overboard. Okay. But Weiss sends an email that's in the record. He admitted – our brief was based on Paul Weiss's testimony, Paul Weiss's emails. It's not based on what I said or what I say in emails or whatever. He says that AOL's lawyers have contacted them and maybe it's a pipe dream, but they want to settle this case and we need to get the discovery, sir. But Mr. Burke shows up today and he's mystified, like, who's Bill Bach? Why is he here? Why does he have any claim? Why didn't he sue us earlier? He says that they didn't hear until February that we didn't cash the $50,000 check. There's not any evidence of that, but what is in the record is that I sent an email because on the very next case, Paul Weiss and Rich Burke tried to pull the same thing on the Knight v. Homecomings case. There's an email in the record and that email says, the problem with the documents is that Paul and Rich are trying to make themselves lead counsel on the settlement and say they have sole discretion over distributing the fees. And when I sent that to Weiss and I sent that to Brad Lakin, I told Weiss that if I would object to the settlement, I would file my own fee petition. We would work it out that way. They backed off, but I said in that email, especially because Weiss hasn't paid my firm's share of the AOL case. That's four months after the $50,000 check. They gave me the $50,000 check about two days before Tom Lakin was indicted. It didn't seem like a good time for me to call Brad and say, Paul Weiss owes me money, I'm going to start litigation, money, money, money. Instead I waited four months and I brought it up. And $50,000 is a lot of money, but, you know, it's not all about suing people and suing your co-counsel and fighting with each other, because at the time we had dozens of cases that we were working on. And it's undisputed that my firm was doing tons of work on the other cases. Most of those cases, because they're contingency cases, and that's why you do them in a group with a bunch of different law firms, is to spread the risk. Most of the cases, 60 of the 70 cases, didn't pay anything at all. And my firm did tons of work. Some briefs and everything else. And I see my time is up. Thank you, Your Honor. Thanks for taking the advice. The court should receive it. Thank you.